**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE: | : | Chapter 7 |
| | : | |
| EDWARD W. POCIUS, | : | |
| | : | Bky. No. 12-19380 ELF |
| Debtor. | : | |
| | : | |
| ROBERT H. HOLBER, TRUSTEE, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | Adv. No. 14-0438 |
| EDWARD W. POCIUS, | : | |
| RUTH J. POCIUS, | : | |
| THOMAS FLAHERTY, | : | |
| AUDRA FLAHERTY, | : | |
| ENDLESS MOUNTAIN INVESTORS, LLC, | : | |
| EVERGREEN VALLEY NURSERY, LLC, | : | |
| | : | |
| Defendants. | : | |

# M E M O R A N D U M

## I. INTRODUCTION

In this adversary proceeding, the Plaintiff Robert Holber, the chapter 7 trustee ("the Trustee"), seeks to avoid certain transfers under 11 U.S.C. §548 and recover the value of the transferred property under 11 U.S.C. §550 from both the initial transferee, several alleged subsequent transferees, and the debtor.

The Trustee contends that Debtor Edward Pocius ("the Debtor") and several other defendants orchestrated an intricate scheme to fraudulently transfer real property, a related oil

and gas lease and certain cash payments the Debtor received under the lease to various insider

entities as well as the individual defendants.

On March 4, 2015, I granted the Trustee's motion for default judgment and, pursuant to

11 U.S.C. §548, avoided three (3) specific transfers made by the Debtor  (collectively referred to

as "the Transfers").

Presently before the court is the Trustee's motion for summary judgment ("the Motion").

Through the Motion, the Trustee seeks to recover the value of the Transfers under 11 U.S.C.

§550(a) in the form of two (2) money judgments against all of the defendants: one (1) for

$990,000.00 and the other for $799,000.00.

For the reasons set forth below, the Motion will be granted in part, and denied in part.


## II.  PROCEDURAL HISTORY

The Debtor filed a voluntary petition under chapter 11 of the Bankruptcy Code on

October 2, 2012.  The bankruptcy case was converted to chapter 7 on December 12, 2012.

On October 1, 2014, the Trustee, filed a complaint, initiating this adversary proceeding,

against: the Debtor, Ruth Pocius (the Debtor's deceased wife) ("Mrs. Pocius"),[1] Thomas Flaherty

---

[1]      Mrs. Pocius filed a chapter 11 bankruptcy case in 2007.  See Bky. No. 07-15966.  Judge
Fox presided over Mrs. Pocius' case.  Her Modified Third Amended Chapter 11 plan was confirmed on
August 21, 2008, portions of which are marginally relevant to this adversary proceeding.  The court
dismissed Mrs. Pocius' case on May 26, 2010 on the motion of the United States Trustee.

Mrs. Pocius died on October, 6, 2014, just five (5) days after the Trustee filed his
Complaint in this adversary proceeding.  The Trustee took no action to substitute a representative of her
decedent's estate as a party.  Therefore, I will not further consider or discuss the Trustee's claims against
her.  See Fed. R. Bankr. P. 7025 (incorporating Fed. R. Civ. P. 25) (after the death of a party, if a motion
to substitute a proper party "is not made within 90 days after service of a statement noting the death, the
action by or against the decedent must be dismissed").

("T. Flaherty"), Audra Flaherty ("A. Flaherty") (T. Flaherty and A. Flaherty collectively, "the

Flahertys"), Endless Mountains Investors, LLC ("Endless"), and Evergreen Valley Nursery, LLC

("Evergreen").

In the adversary complaint, the Trustee seeks to avoid the Transfers and recover their

value for the benefit of the bankruptcy estate.

The Transfers consist of:

> (1) the transfer to Endless of real property consisting of six (6) parcels owned by
> the Debtor and his wife (collectively referred to as "the Doty Hill Property");

> (2) the transfer to Endless of an Oil and Gas Lease related to the Doty Hill
> Property ("the O/G Lease"); and

> (3) the transfer to Evergreen of a $799,000.00 payment made in connection with
> the O/G Lease ("the $799,000 Lease Payment").

On November 17, 2014, T. Flaherty filed an Answer and New Matter as "pro se

attorney," on behalf of himself, as well as A. Flaherty, Endless and Evergreen. (Doc. # 7). On

December 22, 2014, I granted the Trustee's motion to strike that Answer as to all defendants,

except T. Flaherty. (Doc. #s 9, 12). A. Flaherty filed her own Answer and New Matter on

December 18, 2014. (Doc. # 11). Defendants Endless and Evergreen filed no response to the

Complaint.

On January 13, 2015, the Trustee moved for a default judgment against Defendants

Endless and Evergreen. On March 4, 2015, I entered an order granting the Trustee's motion and

avoiding the Transfers. (Doc. # 21).

On September 9, 2015, the Trustee filed the Motion seeking, inter alia, to recover the

avoided transfers pursuant to 11 U.S.C. §550(a). (Doc. # 34). I held a hearing on the Motion on

February 25, 2016.   Following the hearing, I issued an order on March 2, 2016[2] granting: (1) the

Trustee leave to supplement the summary judgment record with additional evidentiary matter and

a supplemental memorandum of law; and (2) the Flahertys time to respond.  (Doc. # 46).[3]

The parties filed supplemental submissions, the last of which was filed on June 28, 2016.

(Doc. #s 48-51, 53).[4]    The Motion is ready for disposition.

---

[2]        The order has a typographical error - it was dated March 2, 2015, instead of 2016.

[3]        In the March 2, 2016 Order, I requested the parties address the following issues:

- If the relevant transfers went to a corporate entity, what legal authorities support the Trustee's contention that an individual in control of that entity is liable under 11 U.S.C. § 550 for the value of the transferred property?

- What in the summary judgment record shows that the individual Flaherty Defendants had sufficient control over the entity that received the relevant transfer so as to impute the benefit of that transfer to them and subject them to liability under § 550?

- What in the record shows the value of the Doty Hill Property?

- Was there consideration provided for the transfer of the Doty Hill Property to Endless Mountain Investors, LLC and if so, was it reasonably equivalent?

- On what basis are the individual Flaherty Defendants liable for the benefit the Debtor derived from any money/transfers the Debtor received from the Evergreen Nursery Account?

- What does the documentary evidence show to be the amount of value that the individual Flaherty Defendants received from transfers made from the Evergreen Nursery Account?

(Id.).

[4]        The March 2, 2016 Order required the last supplemental submission to be filed on or before April 25, 2016.  However, on June 13, 2016, I issued another order granting leave to the Flahertys to further supplement their responses to the Motion by filing affidavits and unsworn declarations relating to and in support of the evidentiary matter they previously filed in opposition to the Motion.  Although

(continued...)

-4-

# III.  FACTS

## A. The Doty Hill Property and the O/G Lease - 2008

As of May 6, 2008, the Debtor and Mrs. Pocius owned the Doty Hill Property, which consists six (6) parcels of land consisting of over 470 acres with access to oil and gas rights in two (2) different townships of Pennsylvania.  For ease, I will refer to the four (4) parcels located in Ridgebury Township as Parcels 1 through 4 and the two (2) parcels located in South Creek Township and Parcels 5 and 6.[5]

On May 6, 2008, the Debtor and his wife entered into the O/G Lease with an entity named East Resources, Inc.  (See Ex. P-1).[6]  In July 2008, the Debtor and his wife received an initial payment of $141,000.00 under the O/G Lease.  (See Exs. P-1 & P-2).  The balance, i.e., what was to become the $799,000 Lease Payment, was scheduled to be paid roughly two and one half (2

---

[4](...continued)
this additional submission was due by June 23, 2016, I accepted the Flahertys late submission on June 28, 2016.

[5]        The four (4) located in Ridgebury Township are:
             Parcel 1 – 30-004.00-006-000-000
             Parcel 2 – 30-004.00-006-002-000
             Parcel 3 – 30-004.00-007-000-000
             Parcel 4 – 30-004.00-008-000-000

          The two (2) located in South Creek Township are:

             Parcel 5 – 40-003.00-080-000-000
             Parcel 6 – 40-003.00-085-000-000
(See Ex. P-4).

[6]        East Resources, Inc., subsequently assigned its interest as lessee in the O/G Lease to Talisman Energy U.S.A., Inc. ("Talisman").  (Ex. P-3).

½) years after that initial payment, i.e., within ninety (90) days after February 24, 2011.  (See Ex. P-1).

### 1.  the Pocius-Endless transfers - 2009

On August 6, 2009, a little more than a year after receiving the initial payment under the O/G Lease and about a year and one half before the $799,000 Lease Payment was due to be paid, the Debtor and his wife transferred the entire Doty Hill Property (all six parcels) and assigned the O/G Lease to Endless.  (Exs. P-4 & P-5).[7]

The exact details of the Pocius-Endless transaction in 2009 are not entirely clear, but the documents in the summary judgment record suggest that:

- Endless paid the Debtor and his wife $1,020,000.00 in consideration, (see Ex. D-1); and

- Endless financed the purchase price;

---

[7]    The Trustee emphasizes that the sale of the Doty Hill Property purportedly was made pursuant to Mrs. Pocius' confirmed plan in Bky Case 07-15966, but that the sale to Endless was never approved by the bankruptcy court.  (Trustee's Stmt Material Facts at ¶¶ 7-8; Ex. P-6).  The Trustee alleges that Mrs. Pocius' confirmed plan provided for the sale of the Doty Hill Property, not to Endless, but to a different entity, Evergreen Land Development, LLC.  (Id. at ¶ 9).

The Trustee's representation is not entirely factually accurate.  While a sale to Endless was not contemplated in Mrs. Pocius' confirmed chapter 11 plan, the plan did not propose to sell the Doty Hill Property to Evergreen Land Development, LLC.  Rather, Article 6.1 of the plan provided that she and the Debtor were supposed to sell the Doty Hill Property to Mountain View Sportsmen, LLC for $500,000.00 on or before August 22, 2008.  (Ex. P-6).  This discrepancy, while perhaps interesting, is irrelevant, for purposes of the Motion.

What matters is that the transfer to Endless was avoided pursuant to the March 4, 2015 Order in this adversary proceeding.  The issue now is to what extent the Trustee can recover the value of the property for the benefit of the estate from the parties named as defendants in this adversary proceeding.

-6-

- Endless may have granted Susquehanna Bank[8] a mortgage on the property, (see Ex. D-9);[9] and

- Endless may have assigned its rights under the O/G Lease to Susquehanna Bank, (Ex. D-7).[10]

**2. the Endless-SPI mortgage transaction- 2009**

After acquiring the Doty Hill Property, Endless granted a mortgage on the property to

Select Properties, Inc. ("SPI") on December 11, 2009 to secure a note in the amount of

$282,000.00 ("the SPI Mortgage").  (Ex. P-28).[11]  The SPI Mortgage contains a clause generally

purporting to assign all of the Doty Hill Property leases to SPI.  Endless also executed a separate

---

[8]      There may have been other lenders participating in the transaction with Susquehanna Bank.  (See Ex. P-31, ¶ 2).

[9]      Ex. D-9 is not a mortgage, but what appears to be a mortgage commitment letter, which describes the grant of a mortgage as a condition of the loan.

[10]     Ex. D-7 is not a fully executed copy of the Assignment.  The copy in the record, which is dated August 20, 2009, is signed by A. Flaherty only, on behalf of Endless.  It is not signed by a representative from Susquehanna Bank despite there being a signature line for a bank representative.

[11]     The property securing the note was for Parcels 2 and 6 only, which appear to be situated next to each other, straddling the two (2) townships with an address of 1863 Doty Hill Road, Ridgebury and South Creek Townships, Bradford County, Pennsylvania.

The SPI Mortgage describes itself as a "first position" mortgage.  This raises some question whether Endless granted Susquehanna Bank a mortgage back in August 2009.  See n.9, supra & accompanying text.  None of the parties have submitted a comprehensive title search that may have clarified these ambiguities.  At the same time, these particular ambiguities may not be material to the disposition of the  Motion.

"Assignment of Rents, Leases, Contracts or Agreements of Sale" in SPI's favor.  (Id.).[12]  T.

Flaherty executed the mortgage and assignment on Endless' behalf as Manager of the LLC.

### 3.  the SPI Mortgage assignment to Mountain View - 2011

The SPI Mortgage was assigned to Mountain View Financial, LLC ("Mountain View")

on May 13, 2011.  (Ex. P-28).[13]

### 4.  the Endless-Mountain View transfer - 2012

On August 13, 2012, about three (3) years after the Pocius-Endless transfers of the Doty

Hill Property and the O/G Lease, and a little more than one (1) year after Mountain View took

the assignment of the SPI Mortgage, Endless transferred title of Parcels 2 and 6 of the Doty Hill

Property to Mountain View.  This transfer was effected through a deed, purportedly given in lieu

of foreclosure by Mountain View on the mortgage that SPI assigned to it.  (Ex. P-24).[14]  T.

Flaherty executed the deed on Endless' behalf, this time as "Member."  The deed does not

---

[12]      It is not clear from the record how the lease assignment to SPI squares with the possible earlier assignment to Susquehanna.  Again, this uncertainty may not be material.

[13]      Paragraph 1(c) of the mortgage assignment purports to assign to Mountain View an Assignment of Rents, Leases, Contracts or Agreements for Sale dated December 11, 2009.  It is unclear whether this refers to the O/G Lease.

[14]      Mountain View is not a defendant in this adversary proceeding.  The Trustee initiated a separate adversary proceeding against Mountain View, which has since been settled.  See Adv. No. 16-37.

specifically reference a transfer of the O/G Lease.

## B. The $799,000 O/G Lease Payment

In March 2011, the Debtor received the $799,000 Lease Payment in the form of a check. When the check was issued, the Debtor had already transferred his rights in the O/G Lease to Endless. Nonetheless, for some unexplained reason, the oil and gas lessee issued the check to the Debtor and Mrs. Pocius. (Ex. P-10).

On March 9, 2011, the Debtor and his wife endorsed the $799,000.00 check and deposited it into a bank account owned by Evergreen, not Endless. (Id.). Although the $799,000 Lease Payment represented Endless' income (albeit apparently pledged to Susquehanna), the Debtor reported $800,000.00 of income from "Drilling Rights" on Schedule C of his personal income tax return for 2011. (Ex. P-12). He testified that he did this out of a concern that Talisman would issue an IRS Form 1099 attributing the income to him personally. (See Ex. 11 at 21). T. Flaherty concurs that the $799,000 Lease Payment went to the Debtor, but asserts that the payment should have been made to Susquehanna Bank in light of the assignment it received in connection with the loan it provided to Endless to facilitate Endless' acquisition of the Doty Hill Property. (See Ex. 31, ¶ 6).

After the Debtor deposited the check into the Evergreen account, there were several withdrawals from the account.

First, on April 16, 2011, the Debtor withdrew $500,000.00 in the form of two (2) checks:

> (1) a $200,000.000 check used to open a new account at TD Bank in the name of Mountain View; and
>
> (2) a $300,000.00, check endorsed by the Debtor and paid to the order of Benner

& Piperato Trust Account on April 27, 2011.[15]

(Ex. P-27).

As to the remaining $299,000.00, the Trustee claims that the Flahertys are liable under 11

U.S.C. §550, an issue that will be discussed below.

## IV. SUMMARY JUDGMENT STANDARD

The legal standard for the entry of summary judgment under Fed. R. Civ. P. 56,

incorporated into bankruptcy adversary proceedings by Fed. R. Bankr. P. 7056, is well

established.

Summary judgment is appropriate only when, drawing all reasonable inferences in favor

of the nonmoving party, there is no genuine issue as to any material fact and the moving party is

entitled to judgment as a matter of law.  E.g., Tri-M Group, LLC v. Sharp, 638 F.3d 406, 415 (3d

Cir. 2011); In re Bath, 442 B.R. 377, 387 (Bankr. E.D. Pa. 2010).  In other words, summary

judgment may be entered if there are no disputed issues of material fact and the undisputed facts

would require a directed verdict in favor of the movant.  See Fitzpatrick v. City of Atlanta, 2 F.3d

1112, 1115 (11th Cir. 1993).

In evaluating a motion for summary judgment, the court's role is not to weigh the

---

[15]     The Trustee contends that this second check of $300,000.00 was funneled to Mountain
View and used to obtain the assignment of the $282,000.00 SPI Mortgage loan, O/G Lease assignment
and guarantees.  (Ex. P-27 & 28).  Thus, the Trustee posits that the lease payments fraudulently
transferred by the Debtor, were later used by Mountain View to obtain title to two (2) of the parcels that
the Debtor fraudulently transferred to Endless.  The "big picture," according to the Trustee is that all of
the transferee entities were controlled by the Debtor and/or the Flahertys, making this all one (1) big shell
game.

evidence, but to determine whether there is a disputed, material fact for resolution at trial.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  A genuine issue of material fact is

one in which sufficient evidence exists that would permit a reasonable fact finder to return a

verdict for the non-moving party.  Id. at 248.  In evaluating the record, the court must view the

underlying facts and make all reasonable inferences therefrom in the light most favorable to the

party opposing the motion.  E.g., Montone v. City of Jersey City, 709 F.3d 181, 189 (3d Cir.

2013); United States v. 717 South Woodward St., 2 F.3d 529, 533 (3d Cir. 1993).  On the other

hand, if it appears that the evidence "is so one-sided that one party must prevail as a matter of

law," the court should enter judgment in that party's favor.  Anderson, 477 U.S. at 252.

Proper resolution of a motion for summary judgment also requires consideration of the

parties' respective burdens.  The moving party's initial burden is to demonstrate that there are no

disputed issues of material fact.  E.g., U.S. v. Donovan, 661 F.3d 174, 185 (3d Cir. 2011); Aman

v. Cort Furniture Rental Corp., 85 F.3d 1074, 1080 (3d Cir. 1996); Chipollini v. Spencer Gifts,

Inc., 814 F.2d 893, 896 (3d Cir. 1987).  How the movant meets this burden and how the

respondent may rebut the movant's showing is affected by the allocation of the evidentiary

burden of persuasion if the dispute were to proceed to trial.

Where, as here, the movant is the plaintiff and has the burden of proof at trial, the movant

must show that no reasonable jury could find for the non-moving party.  The movant must

"support its motion with credible evidence  .  .  .  that would entitle it to a directed verdict if not

controverted at trial."  Fitzpatrick, 2 F.3d at 1115 (citation omitted).  The evidence must establish

"all the essential elements of its case on which it bears the burden of proof at trial, [such that] no

reasonable jury could find for the non-moving party."  Id. (citation omitted); see also Bath, 442

B.R. at 387.  If the movant (with the burden of proof at trial) meets this initial burden, the

responding party may not rest on the pleadings, but must designate specific factual averments

through the use of affidavits or other permissible evidentiary material which demonstrate a

genuine issue of material fact to be resolved at trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 324

(1986); Anderson, 477 U.S. at 247-50.


# V.  RECOVERY UNDER 11 U.S.C. §550(a)

On March 4, 2015, I entered judgment by default against Endless and Evergreen on the

Trustee's motion, thereby avoiding the Transfers.  Through the present Motion, the Trustee seeks

to recover the value of the Transfers from the defendants pursuant to 11 U.S.C. §550.

11 U.S.C. §550(a) provides, in relevant part, that

> to the extent that a transfer is avoided  .  .  .  the trustee may recover, for the
> benefit of the estate, the property transferred, or, if the court so orders, the
> value of such property, from–
>
> > (1) the initial transferee of such transfer or the entity for whose benefit
> > such transfer was made; or
> >
> > (2) any immediate or mediate transferee of such initial transferee.

A deconstruction of §550(a) instructs that the trustee may recover fraudulent transfers of

the debtor made to recipients of either the (1) initial transfer or (2) subsequent transfers.

Subsection 550(a)(1) pertains to the initial transfer and provides for two (2) categories of

parties that may be liable: (1) the "initial transferee" or (2) a party that was not the initial

transferee, but "for whose benefit such transfer was made," (a "beneficiary transferee").

Subsection 550(a)(2) pertains to subsequent transfers and permits the trustee to recover an

-12-

avoided transfer (or its value) from subsequent transferees of the initial transferee.  However,

liability under §550(a)(2) is subject to a good faith defense set forth in section §550(b).

     The Trustee seeks recovery of transfers of the Debtor under all of these legal theories.

# VI.  RECOVERY OF THE VALUE OF THE DOTY HILL PROPERTY AND  O/G  LEASE

     The Trustee alleged in the Complaint that the Transfers were fraudulent and that the

Debtor and T. Flaherty orchestrated the transfers to prevent certain creditors of the Debtor,

including UPS Capital,[16] from reaching the Doty Hill Property and the revenue from the O/G

Lease.  (Compl. ¶¶ 24, 28).  The transfers of the Doty Hill Property and the O/G Lease were

avoided pursuant to my March 4, 2015 Order.  The Trustee now seeks recovery for those avoided

transfers under §550 against several defendants: Endless, the Debtor and the Flahertys.

     I will discuss each defendant separately below.

## A.  Recovery from Endless

     There is no dispute that Endless was the initial transferee under §550(a)(1) of the Doty

Hill Property.[17]  The present question is whether the Trustee is entitled to summary judgment

---

[16]    UPS Capital obtained a judgment against Pocius and his son, Michael, jointly and severally, on June 11, 2008 in the amount of $5,181,176.40.  (Exs. P-13 & 14).

[17]    The Trustee argues, in the alternative that the Flahertys were the initial transferee.  That claim is discussed in Part VI.C., infra.  As for the $799,000 Lease Payment, it is less clear that Endless was the transferee of that asset, the payment from the Debtor having been deposited in the Evergreen account.  The Trustee's claim against Endless as to the $799,000 Lease Payment is discussed in Part VII, infra.

against Endless for the **value** of the Doty Hill Property.

The Trustee's request for summary judgment against Endless under §550(a) creates certain conceptual difficulties.

The Trustee seems to treat the transfer of the real property as entirely distinct from the O/G Lease. To some extent, this is understandable insofar as the owner of real property can carve out components of the "bundle rights" included in fee ownership and transfer certain components (like the right to receive the payments due after the conveyance of a leasehold interest) to third parties. Yet, the trail of transfers here suggests that title to the real property and the leasehold rights remained united (perhaps subject to an assignment of the O/G Lease to Susquehanna). Or, at least that seems to be the case with respect to the initial transfer from the Debtor and his wife to Endless. Nevertheless, in the Motion, the Trustee focuses separately on the transfer of the Doty Hill Property to the exclusion of the O/G Lease.

This Trustee's approach creates an issue in evaluating his right to recover the value of the transferred property.

In the Complaint, the Trustee acknowledged that the Debtor received $1.2 million in the Pocius-Endless transfer, i.e., the initial transfer. (Compl. ¶ 14). Yet, in support of the Motion, the Trustee submitted evidence that the value of the Doty Hill Property at the time of the transfer was $990,000.00.[18] This figure excludes the value of the oil and gas rights, which the Trustee

---

[18]     Shortly after the dismissal of Endless' second chapter 11 bankruptcy case on April 2, 2013, and after notice and hearing, this court entered an order barring Endless from filing a new case without leave of court. (See Bky No. 13-11637, (Doc. #'s 8, 13)). On May 28, 2013, Endless filed a motion seeking leave to file a new chapter 11 petition. Attached to that motion were the proposed schedules, which listed the Doty Hill Property's value as $990,000.00 under Schedule A. (See id., Doc. # 16). The motion was denied without prejudice. (Id., Doc. # 17). The Trustee's Exhibit P-17 includes the proposed Schedule A, which was verified by Edward Pocius. As a principal of Endless, Pocius is

(continued...)

separately valued at $1,206,000.00.[19]

Given the state of the record, certain questions immediately come to mind. How was the initial transfer of the Doty Hill Property fraudulent under §548? Should the court reconsider the judgment entered by default avoiding the initial transfer of the Doty Hill Property? If the avoidance judgment stands, how is the value of the property calculated for purposes of granting relief under 11 U.S.C. §550(a) – i.e., does the defendant get a credit for the consideration paid? (Obviously, if such credit is given, the credit exceeds the value of the property and the Trustee is not entitled to a money judgment for the value of the property transferred).

---

[18](...continued)
competent to give lay testimony of the value of the real estate owned by his entity. See In re Lake Tahoe Partners, LLC., 2016 WL 1626798, at *3 (Bankr. N.D. Cal. Apr. 21, 2016); In re Biddiscombe, Intern., LLC, 392 B.R. 909, 918-19 (Bankr. M.D. Fla. 2008).

[19]       In his supplemental brief, the Trustee also offered some background information regarding the Debtor and the Flahertys' attempts to monetize value of the Doty Hill Property oil, gas and mineral rights, implying that the Doty Hill Property might be worth more than $990,000.00, at least when the oil, gas and mineral rights are considered.

Specifically, the Trustee explained how the Flahertys and the Debtor actively engaged in selling investment participation in the Doty Hill Property. Their action later became the subject of a complaint filed against them by Richard B. and Catherine P. Carpenter ("the Carpenter Complaint"). In the Motion, the Trustee attached certain exhibits from the Carpenter Complaint to support his contention that, notwithstanding who held record title, the Flahertys controlled the disposition the Doty Hill Property (discussed in Part VI.C.). (See Pl. Supp. Br., Ex. P-A.) In his supplemental brief, the Trustee pointed out that the Carpenter Complaint included copies of documents the Carpenters received from the Flahertys and the Debtor for solicitation purposes. He asserts that those documents are probative of the value of the Doty Hill Property. Those documents include a confidential memorandum to Rick Carpenter from T. Flaherty dated October 8, 2010, valuing the Doty Hill Property, inclusive of mineral rights, at $7,050,000.00.

In the end, however, the Trustee argues that the best evidence of the value of the Doty Hill Property is Endless' admission in the proposed bankruptcy schedules, stating the value was $990,000.00, independent of the oil and gas rights.

In deciding how to resolve these questions, I am influenced by two (2) considerations.

First, while a majority of the reported cases hold that in calculating a trustee's entitlement to recover "the value" of the property transferred under §550(a), a transferee is entitled to a credit or a setoff of the value given to the transferor in the avoided transaction,[20] some courts have held the Code does not provide for such a credit or setoff.[21] Thus, there is some legal authority for the Trustee's position and Endless does not appear to contest that position in this adversary proceeding. In the absence of a true adversarial process, I am reluctant to decide this significant legal issue adversely to the party who has appeared before the court.

Second, not only has Endless failed to appear and contest the Trustee's claim, but also, by all indications, Endless is nothing more than a corporate shell. Thus, the entire controversy between the Trustee and Endless under §550(a) has the appearance of an academic exercise.

These two (2) considerations lead me to conclude that it is appropriate to grant the Trustee the relief requested against Endless. I will grant summary judgment against Endless under 11 U.S.C. §550(a) in the amount of $990,000.00 for the value of the Doty Hill Property

---

[20]     See, e.g., Asarco LLC v. Ams. Mining Corp., 404 B.R. 150, 176 (S.D. Tex. 2009); In re Clarkston, 387 B.R. 882, 891 (Bankr. S.D. Fla. 2008); In re Hill, 342 B.R. 183, 205 (Bankr. D.N.J. 2006); In re Colonial Realty Co., 226 B.R. 513, 525 (Bankr. D. Conn. 1998); In re Shape, Inc., 176 B.R. 1, 3 (Bankr. D. Me. 1994).

[21]     See In re Rice, 83 B.R. 8, 12-13 (B.A.P. 9th Cir. 1987); In re Interstate Cigar Co., 285 B.R. 789, 801-802 (Bankr. E.D.N.Y. 2002); see also In re Straightline Invs., 525 F.3d 870, 883-885 (9th Cir. 2008) (setoff denied where transferee was not an innocent, unsuspecting creditor).

that the Debtor transferred to Endless.[22]

## B.  Recovery from the Debtor

The Trustee also seeks recovery from the Debtor.  This claim fails on the basis of a plain

textual reading of the statute.

Section 550(a) provides for recovery from <u>transferees</u>.  In this transaction, the Debtor is

the <u>transferor</u> of the Doty Hill Property; not a transferee.  Therefore, it defies logic how the

Trustee could recover from the Debtor under §550(a)(1) without any claim that the Debtor was

the initial transferee (or even the entity for whose benefit such transfer was made).  There also is

no allegation or evidence that the Debtor was a subsequent transferee under §550(a)(2).

Therefore, summary judgment against the Debtor under §550 for the Doty Hill Property and the

O/G Lease will be denied.

---

[22]      To be clear, by granting relief against Endless, essentially by default, I have not decided the legal issue whether a §550(a) defendant is entitled to a credit or setoff for the consideration paid in the avoided transaction.

      The Trustee presses the same request and legal theory against the Flahertys, seeking a $990,000.00 judgment against them as subsequent transferees of the Doty Hill Property.  However, as explained below in Part VI.C., I am denying the Trustee's request for summary judgment against them on other grounds, making it unnecessary to decide the "credit/setoff" issue at this time.  However, the issue remains for trial.  At trial, if the Trustee overcomes the shortcomings in his"case" against the Flahertys that have resulted in the denial of his request for summary judgment and if the Flahertys defend on the ground that they are entitled to a credit or a setoff, I am prepared to decide the issue on the merits.

## C. Recovery from the Flahertys As Initial Transferees

A more complex analysis is necessary with respect to the Trustee's §550(a)(1) claim against the Flahertys.  Endless, not the Flahertys was the record "initial transferee" of the Doty Hill Property and the O/G Lease.  Faced with this fact, the Trustee offers two (2) alternative legal theories for recovery against the Flahertys under §550(a)(1).

The Trustee first puts forward an alter ego theory of liability.[23]  Essentially, the Trustee asserts that the corporate form of Endless should be pierced and that the Flahertys should be treated as initial transferees and held liable for the fraudulent transfers the Debtor made to Endless.

Alternatively, the Trustee seeks to recover under the "beneficiary" theory of liability.  He asserts that the Flahertys are liable for the transfers because they benefitted for a debt paid, even though they did not receive the money.  The Trustee argues that, even though neither the Doty Hill Property nor the O/G Lease were transferred to the Flahertys, they are liable under §550(a)(1) because the transfers effected a satisfaction of other debts they owed, thereby benefitting them.

Both theories fail at the summary judgment stage.

---

[23]       The Trustee's brief raised the issue in an unacceptable manner.  The brief provided little more than a "headline," stating the theory.  The Trustee failed to cite supporting case law and failed to offer even a bare bones legal analysis.  In these circumstances, I would be justified in rejecting the argument based solely on the Trustee's failure to express it adequately.  However, in order to make progress in bringing the adversary proceeding to a conclusion, I will analyze the issue on the merits.

**1. alter ego theory**

There is case law supporting the use of an alter ego theory of liability under 11 U.S.C.

§550. See, e.g., In re Alpha Protective Servs., Inc., 531 B.R. 889, 909-10 (Bankr. M.D. Ga.

2015) (invoking Georgia "alter ego" law and denying defendant's motion for judgment on the

pleadings); In re Hansen, 341 B.R. 638, 643 (Bankr. N.D. Ill. 2006) (acknowledging applicability

of "alter ego" theory under §550(a), applying Illinois law, but granting defendant summary

judgment for lack of evidence).[24]

The theory is very straightforward.  If, under applicable nonbankruptcy law (typically

state law), an artificial entity defendant is the "alter ego" of an individual, the entity's liability

under §550(a) also is imposed on the individual.

Under Pennsylvania law, there is a strong presumption in favor of respecting the veil of

an artificial entity.  See Lumax Indus., Inc. v. Aultman, 669 A.2d 893, 895 (Pa. 1995); Allegheny

Energy Supply Co., LLC v. Wolf Run Min. Co., 53 A.3d 53, 59 n.7 (Pa. Super. Ct. 2012); In re

Cornmesser's, Inc., 264 B.R. 159, 163 (Bankr. W.D. Pa. 2001).  Courts will set aside the strong

presumption in favor of shielding shareholders of corporations and members of limited liability

companies ("LLC's") from liability for the obligations of their entity only to "prevent fraud,

illegality, or injustice, or when recognition of the .  .  . entity would defeat the public purpose or

shield someone from a liability for a crime."  In re Jamuna Real Estate, LLC, 365 B.R. 540, 563

(Bankr. E.D. Pa. 2007) (quoting Zubik v. Zubik, 384 F.2d 267, 272 (3d Cir. 1967)).  Further, "a

---

[24]     In some cases, an alter ego theory has been pleaded as a separate claim from the §550(a)
claim. See, e.g., In re Pallisades at West Paces Imaging Ctr, LLC, 501 B.R. 896, 922 (Bankr. N.D. Ga.
2013).  Here, however, the Trustee did not assert a separate cause of action, but requests the court to
apply the theory within the context of its analysis under §550.

very high showing of domination and control" is necessary to establish "alter-ego" liability. <u>Jiffy Lube Int'l, Inc. v. Jiffy Lube of Pennsylvania, Inc.</u>, 848 F. Supp. 569, 580 (E.D. Pa. 1994).

Generally speaking, alter ego liability on an individual may be imposed "whenever one in control of a corporation uses that control, or uses the corporate assets, to further his or her own personal interests." <u>Ashley v. Ashley</u>, 393 A.2d 637, 641 (Pa. 1978) (citation omitted).

Alter ego liability requires proof establishing two (2) elements:

> (1) the party exercised domination and control over the entity; and

> (2) injustice will result if the corporate fiction is maintained despite a unity of interests between the entity and its principal.

<u>In re Kitchin</u>, 445 B.R. 472, 481-82 (Bankr. E.D. Pa. 2010) (citing cases).

To some extent, the first element bleeds into the second. It is not satisfied by the mere fact that an individual is responsible for the actions for the artificial entities. Entities such as corporations and LLC's necessarily act through the actions of natural persons, typically, their officers, directors and members. Thus, an individual's status as an officer, director or manager, standing alone, does not establish dominion and control under the alter ego doctrine. <u>See</u> <u>In re Delta Phones, Inc.</u>, 2005 WL 3542667, at *7 (Bankr. N.D. Ill. Dec. 23, 2005).

Nor does complete stock ownership or "the presence of interlocking boards and officers" suffice, by themselves, to establish a viable alter ego claim. <u>See</u> <u>Cornmesser's</u>, 264 B.R. at 163; <u>In re Nutri/System, Inc.</u>, 1994 WL 96963, at *5 (Bankr. E.D. Pa. 1994). There must be something more to constitute "dominion and control" for purposes of invoking the alter ego doctrine. The control wielded by the individual must amount to "complete domination, not only of finances but of policy and business practice in respect to the transaction attacked so that the [corporate entity] as to this transaction had at the time no separate mind, will or existence of its

own." Nutri/System, Inc., 1994 WL 96963, at *5 (quotations and citations omitted).  Further, the individual's use of the control of the entity's actions or assets must have been employed to further the personal interests the individual.  Ashley, 393 A.2d at 641.

The second element, which focuses on the inequity of respecting the separateness of the artificial entity, requires that courts apply a "totality of the circumstances" test in determining whether to impose alter ego liability.  E.g., Kitchin, 445 B.R. at 481-82.

Here, the Trustee has not met his burden at the summary judgment stage of establishing evidence of dominion and control.

The Trustee's evidence of amounts to nothing more than the facts that

- T. Flaherty was the manager of Endless;

- A. Flaherty was listed as the organizer of Endless;

- A. Flaherty  was the trustee of an organization with 80% control of Endless; and,

- A. Flaherty's took certain actions on behalf of Endless - specifically, signing the HUD-1 (Ex. D-1) and the O/G Lease Assignment (Ex. P-5) in the Doty Hill Property transaction.

This evidence is insufficient, not even come close to meeting the requisite evidentiary standard.  See Hansen, 341 B.R. at 643 (individual defendant's status as president and majority shareholder "not remotely enough" evidence to establish alter ego status).  Therefore, I will deny the Trustee's request for summary judgment against the Flahertys under §550(a) based on his alter ego theory of liability.[25]

---

[25]    Some courts have employed a variant of the "alter ego" theory by focusing on whether the individual defendant has dominion and control over the specific asset that was fraudulently transferred, rather than the overall domination of the artificial entity by the individual defendant.  See  In
(continued...)

## 2. beneficiary theory

As his alternative legal theory for recovery against the Flahertys, the Trustee contends

that they were "beneficiary transferees" of the transfers within the meaning of 11 U.S.C.

§550(a)(1).

"The key to pegging the entity for whose benefit the initial transfer was made has two

sides: 1) the entity must be the intended beneficiary and 2) the intended benefit must originate

from the initial transfer." In re Dreier, LLP, 452 B.R. 451, 466 (Bankr. S.D.N.Y. 2011) (quoting

Sec. Inv'r Prot. Corp. v. Stratton Oakmont, Inc., 234 B.R. 293, 314 (Bankr. S.D.N.Y. 1999)).

Further, the benefit must be (1) direct, (2) accessible, and (3) quantifiable.  See Dreier, 452 B.R.

at 466; Cahillane, 408 B.R. at 206;[26] see also Delta Phones, 2005 WL 3542667, at *6 (mere

---

[25](...continued)
re Cahillane, 408 B.R. 175, 205 (Bankr. N.D. Ind. 2009); Delta Phones, Inc., 2005 WL 3542667, at *3.
These cases follow the seminal case Bonded Financial Services, Inc. v. European American Bank, 838
F.2d 890 (7th Cir. 1988), in which the court stated that "the minimum requirement of status as a
'transferee' is dominion over the money or other asset, the right to put the money to one's own
purposes." Id. at 893.

The Trustee's evidence is inadequate under this variant as well.

The Trustee says only that the transfers provided the Flahertys with the opportunity "to
exploit the anticipated oil and gas boom that would make significant profits for all participants." (See
Trustee's Supp. Br. at 5).  Perhaps this is true, but the asserted benefit is too general, amorphous and
indistinguishable from the ordinary benefits of corporate stock ownership or LLC membership to warrant
a finding that the Flahertys were initial transferees under §550(a)(1).  The Trustee has a much higher
burden to meet.

[26]    A guarantor is the quintessential example of an entity for whose benefit a transfer was
made.  A guarantor, is liable under §550(a)(1), even though he did not receive the money (or property)
transferred, because the transfer extinguished the debt and he is no longer exposed to liability on the
guarantee.  See, e.g., Bonded Fin. Servs., 838 F.2d at 895.

ownership interest in a corporation does not somehow mean that all transfers made to the corporation or by it are automatically made for the benefit of the shareholder under section 550(a)(1)).

The evidence in the record supporting the Trustee's "beneficiary transferee" argument is virtually non-existent.  See n.25, supra.  Therefore, I conclude the Trustee has not met his burden and will deny his request for summary judgment under §550(a)(1) against the Flahertys as initial transferees of the Doty Hill Property and the O/G Lease.  Accord Baker O'Neal Holdings, Inc. v. Ernst & Young, LLP, 2004 WL 771230, at *13 (quoting Mack v. Newton, 737 F.2d 1343, 1359-60 (5th Cir. 1984) (an "incidental, unquantifiable, and remote" benefit does not confer beneficiary transferee status under §550(a)(1)).[27]

### D.  Recovery from the Flahertys As Subsequent Transferees

To the extent the Trustee seeks to apply the theories described above to recover against the Flahertys as subsequent transferees based on their interest in and relationship to Mountain View (the record subsequent transferee), the Trustee's case again comes up woefully short.

Any recovery against the Flahertys as subsequent transferees is based on 11 U.S.C.

---

[27]    The Flahertys deny they received any relief from a debt that was paid at the time the Debtor transferred the Doty Hill Property and the O/G Lease to Endless.  Rather, T. Flaherty claims he took on the additional burden of financial guaranties related to the bank financing utilized at the time of the transfers to Endless.  However, the exhibit offered to support this factual allegation, Ex. D-9, is suspect.  Exhibit D-9, dated July 29, 2009, appears to be a letter from Susquehanna Bank describing the terms for a loan for Endless to purchase a certain "evergreen nursery," but also makes reference to Mountain View Investment Partners, LLC as a borrower.  There are no signatures on this document and there is no corresponding note.  Frankly, I do not even know how this relates to the Doty Hill Property.  Consequently, I do not find this to be competent evidence.  Fortunately for the Flahertys, the Trustee failed to meet his initial evidentiary burden on this issue.

§550(a)(2).  Unlike §550(a)(1), §550(a)(2), by its plain language, limits liability to the subsequent transferees themselves; it does not provide for liability of a person for whose benefit a transfer was made.  Thus, the "beneficiary" liability does not even come into play under §550(a)(2).  See In re Bullion Reserve of North America, 922 F.2d. 544 (9th Cir. 1991); Bonded Financial Services, 838 F.2d at 895-96.[28]

This leaves only the "alter ego" theory as a possible basis for recovery.  It is not even clear that the Trustee has even made alter ego type allegations as to the Endless-Mountain View transfers.  To the extent that he as, just as his evidence on "alter ego" was inadequate to support the §550(a)(1) claim, it is equally inadequate under §550(a)(2).  Consequently, the Trustee's request for summary judgment against the Flahertys as subsequent transferees under §550(a)(2) for the transfer of the Doty Hill Property and the O/G Lease to Mountain View will be denied.

---

[28]        As explained in Bonded:

> The structure of the statute separates initial transferees and beneficiaries, on the one hand, from "immediate or mediate transferee[s]", on the other. The implication is that the "entity for whose benefit" is different from a transferee, "immediate" or otherwise. . . .  Someone who receives the money later on is not an "entity for whose benefit such transfer was made"; only a person who receives a benefit from the initial transfer is within this language."

838 F.2d at 895-96.

## VII.  RECOVERY OF THE  $799,000 LEASE PAYMENT

The March 5, 2015 Order avoided the Debtor's transfer to Evergeen of the $799,000

Lease Payment.  The Trustee contends that the Debtor and the Flahertys withdrew virtually of all

of that money from the Evergreen account and spent it on themselves, either directly or through

the various entities.  Consequently, the Trustee seeks to recover the $799,000 (or a portion

thereof) under §550(a) against the Flahertys, the Debtor and Endless, as well as Evergreen.


### A.  Recovery from Evergreen

There is no dispute that Evergreen was the initial transferee under §550(a)(1) of the

$799,000.00 deposit made by the Debtor.  Therefore, I will grant summary judgment in favor of

the Trustee and against Evergreen for the value of that transfer:  $799,000.00.


### B.  Recovery from Endless

In his supplemental brief, the Trustee identified a total of  $38,690.58 paid from the

Evergreen account that he claims indirectly benefitted Endless.[29]  Specifically, he identified

twelve (12) checks, most of which were written to Susquehanna Bank and the Peoples State

Bank and nearly all had a notation of "EMI" (presumably to signify Endless Mountains

Investors).  Not one check was written to Endless, however.

To recover from Endless, the Trustee must establish that Endless was a subsequent

_____

[29]        The Trustee also characterizes these withdrawals as benefitting the Flahertys.
(See Trustee's Supp. Br. at 10).

transferee under §550(a)(2).  He failed to do so.  Perhaps these payments were made for Endless'

benefit (i.e., repayment of debt), but, as a matter of law, that is insufficient for the imposition of

liability.  See Part VI.D., supra.  There is no evidence indicating that Endless directly received

these payments.  Therefore, I will deny summary judgment against Endless on the basis that it is

a subsequent transferee under § 550 (a)(2).

### C.  Recovery from the Debtor

Although the Trustee seeks recovery from the Debtor for this transfer, the Trustee has not

articulated any legal theory for doing so or quantified any transfers to the Debtor.  Therefore, I

will deny the Trustee's request for summary judgment against the Debtor.

### D.  Recovery from the Flahertys

### 1.

A liberal reading of the Trustee's supplemental brief suggests that he is attempting to

establish liability against the Flahertys as initial transferees (or beneficiary transferees) of the

entire $799,000.000 under §550(a)(1).  He claims that T. Flaherty had "sufficient control" over

the Evergreen account because he was identified as the manager of Evergreen in an Agreement of

Sale submitted by the Defendants (Ex. D-2) (see also Def's Resp. to Stmt. of Mat. Facts, ¶ 12

(Doc. #42)).  The Trustee also claimed that T. Flaherty had sufficient control over Evergreen

because he had authority to make distributions from the Evergreen account or to designate

someone else (i.e., the Debtor).

Based on the Trustee's comments, I interpret his argument to be the same as the one the he offered as to T. Flaherty's relationship with Endless - i.e., that Evergreen is really the alter ego of T. Flaherty.  Presuming that is the Trustee's position, I conclude again that record is inadequate to support the entry of summary judgment on this issue.

To establish that T. Flaherty was the "initial transferee" using an alter ego theory under §550(a)(1), the evidence of control and domination must amount to far more than that offered by the Trustee.  Therefore, for the same reasons I articulated above in Part VI.C.1, I will deny the Trustee's request for summary judgment.

## 2.

Alternatively, the Trustee seeks to recover from the Flahertys certain amounts of the $799,000.00 that he claims Evergreen transferred to the Flahertys or to third parties for their benefit.

In his brief, the Trustee itemizes approximately $377,000.00 in transfers that he claims the Flahertys received either directly or indirectly from the Evergreen Account:

**Amounts directly paid to/for Flahertys**:

| | |
|---|---|
| Total Checks | $17,913.00 |
| Total Wires | $26,500.00 |
| Total Visa Account | $12,164.40 |
| **Total** | **$56,577.40** |

**Indirect transfers paid to Endless and extinguishment of personal guaranty:**

| | |
|---|---|
| Endless Total | $38,960.58 |
| Mountain View Financial Guaranty | $282,000.00 |
| **Total** | **$320,960.58** |

Of the $56,577.40 the Trustee claims the Flahertys directly received, I attribute only $39,400.00 to either T. Flaherty or A. Flaherty.  That amount represents the transfers in which at

least one of them was the payee of a check or the recipient of a wire transfer.  (See Exs. P-21 &

22).[30]

     With respect to the indirect transfers from Evergreen to the Flahertys, (i.e., all but

$39,400.00), the Trustee's claim fails.  He argues that the Flahertys benefitted from these

collective transfers, even though they did not directly receive the funds.  I will deny summary

judgment for the same reasons I articulated earlier: beneficiary transferees are not subject to

liability under 11 U.S.C. §550(a)(2).

     This leaves for consideration the evidence that Evergreen transferred $39,400.00 directly

---

[30]     The transfers expressly attributed to A. or T. Flaherty were:

| Check | Date | Amount | Payee |
|---|---|---|---|
| 934 | 4/11/11 | $2,000.00 | A. Flaherty |
| 935 | 4/28/11 | $10,900.00 | A. Flaherty |
| Wire | 3/17/11 | $10,000.00 | A. & T. Flaherty |
| Wire | 3/18/11 | $10,000.00 | A. Flaherty |
| Wire | 3/28/11 | $ 6,500.00 | A. Flaherty |

I did not include the following checks, despite the notations, because it is not evident that the transfer went directly to either T. or A. Flaherty.

| Check | Date | Amount | Payee | Notation |
|---|---|---|---|---|
| 933 | 4/11/11 | $3,703.00 | William Tuma | T. Flaherty |
| 850 | 5/6/11 | $1,310.00 | Eagles | Tom & Audra - dated 12/23/10 |

I also did not include the $12,164.40 worth of transfers from the visa debit card because (1) there is no evidence they went directly to the Flahertys; and (b) even if they benefitted from those debits, they cannot be the "beneficiary transferees" as subsequent transferees under §550(a)(2).

-28-

to the Flahertys.  To that extent, the evidence does support the Trustee's contention that the

Flahertys were subsequent transferees of the avoided Pocius-Evergreen transfer.

In response, the Flahertys invoke the good faith defense under §550(b).  They claim they

were creditors of Evergreen, based on loans they made directly or indirectly to Evergreen.  (Def.

Supp. Br. at 8).

To support their defense, the Flahertys have offered a promissory note for $75,000.00

dated June 19, 2008 between Evergreen and the Debtor, as the makers, and VAI, Inc. ("VAI"), as

the payee.  (See Ex. D-Supp-3).  They present this document as an illustrative "example" of their

lending relationship with Evergreen.

VAI is the creditor on the note, not the Flahertys.  And, although A. Flaherty's name is

mentioned in the promissory note, it is only for purposes of giving notice to VAI, when required

under the note.  From this evidence, I infer only that A. Flaherty likely is an officer, director

and/or shareholder of VAI.  This evidence does not establish that the Flahertys, **as individuals**,

were creditors of Evergreen or that the Evergreen transfers to them were made in satisfaction of a

debt.

The Flahertys cannot have it both ways.  They cannot enjoy the protection of the

corporate shield when the Trustee tries to hold them responsible for transfers to an entity in

which they have an interest and then ask the court to disregard the corporate distinction to

support a good faith defense when the Trustee proves the existence of subsequent transfers made

to them personally.

Accordingly, there is no evidentiary foundation for the Flahertys' argument that they

accepted payment from Evergreen in satisfaction of Evergreen's liability to them and in good

faith.  On this record, they have fallen short of their goal of establishing the existence of a

disputed issue of material fact as to their good faith.  Therefore, I will grant summary judgment

against the Flahertys in the amount of $39,400.00 pursuant to §550(a)(2).

## VIII.  CONCLUSION

This case involves a labyrinth of entities with overlapping boards, as well as transactions

that facially appear to have been used to shelter from creditors a valuable property.  At a

minimum, the convoluted series of transfers among the Debtor, the various entities and the

Flahertys raises red flags.  But the fabric is complicated to unravel and the Trustee has not done

so in a manner sufficient to impose liability on all the parties to the extent he has requested at the

summary judgment stage.  Consequently, of the potential recovery the Trustee seeks under 11

U.S.C. §550(a) , I will grant only partial summary judgment against Endless in the amount of

$990,000.00 for the value of the Doty Hill Property, against Evergreen in the amount of

$799,000.00 and against the Flahertys in the amount of $39,400.00.  All of the remaining claims

for summary judgment will be denied.

An appropriate order follows.



**Date: <u>August 29, 2016</u>**

**ERIC L. FRANK**
**CHIEF U.S. BANKRUPTCY JUDGE**